UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. ___: _____-cv-____-____

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

SHAWN E. GOOD,

Defendant.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff, Securities and Exchange Commission ("Commission"), files this Complaint and alleges the following:

### SUMMARY

1. This matter concerns a multi-year Ponzi scheme perpetrated by a Wilmington, North Carolina resident, Shawn E. Good ("Good"), involving his clients at Morgan Stanley Smith Barney, LLC ("Morgan Stanley"). Good defrauded his clients—novice investors who trusted Good, including retirees and a single mother of young children---of at least $4.8 million, resulting in more than $2 million of investor losses.

2. Beginning in or about December 2012, and continuing through at least February 2022, Good solicited clients to transfer funds to his personal bank account, ostensibly to make low-risk investments in real-estate development projects and supposedly tax-free government bonds. But Good instead use those funds to repay other investor victims and to pay his personal expenses.

1

3. Good, in fact, used those funds to repay his earlier victims and also to pay his personal expenses, such as payments towards his Tesla, over $800,000 in credit-card bills, and Venmo transfers with memo lines such as: "because youre sexy" (sic); "tattoo"; "Hotel for Destiny"; "Nailz"; and "shopping." Bank records and other evidence show that Good defrauded investors of at least $4.8 million, resulting in at least $2 million of investor losses.

4. For example, one victim identified herein as **Investor 5** is a single mother and choir singer with limited income. She relied on her assets at Morgan Stanley (from a divorce settlement) to pay living expenses for herself and her young children. But she lost $1,325,000 of those assets in Good's Ponzi scheme, representing most of her livelihood. Similarly, her mother, identified herein as **Investor 4**, is another Good victim, who has lost at least $933,750 in Good's scheme. **Investor 4** had specifically advised Good she needed safe investments in order to be prepared to pay nursing-home expenses in future years.

5. To date, the Commission staff has identified at least $4.8 million of investor funds drawn into this scheme, resulting in at least $ 2 million of investor losses. At least three investors are currently owed money as a result of investing in Good's scheme.

6. During testimony, Good invoked his Fifth Amendment right against self-incrimination to virtually every question—including when asked about his future plans to raise funds and/or to conceal assets.

## VIOLATIONS

7. Defendant Good, by virtue of his conduct, directly or indirectly, has engaged in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

8. The Commission seeks as relief a temporary restraining order, preliminary and permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest thereon, and a civil penalty.

9. Further, the Commission seeks a conduct-based injunction that permanently enjoins Good from directly or indirectly, including, but not limited to, through any entity owned or controlled by Good, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent the Defendant from purchasing or selling securities for his own personal accounts.

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to authority conferred upon it by Sections 20(b), (c) and (d) of the Securities Act [15 U.S.C. §§ 77t(b)-(d)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d)-(e)] to enjoin the defendant from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for disgorgement of illegally obtained funds and other equitable relief, and for civil money penalties.

11. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. §80b-14].

12. The Defendant, directly and indirectly, has made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce, and the means and

instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

13. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9], because certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act, Exchange Act and Advisers Act have occurred within the Eastern District of North Carolina.

## THE DEFENDANT AND RELATED ENTITY

14. **Shawn E. Good**, age 55 resides in Wilmington, North Carolina. Good was dually registered with Morgan Stanley Smith Barney, LLC, as a registered representative and an investment adviser. On February 14, 2022, the firm terminated Good for refusing to cooperate with an internal review related to the conduct herein. Good repeatedly asserted the Fifth Amendment privilege during testimony before the Commission during the investigation that preceded this litigation.

15. **Morgan Stanley Smith Barney, LLC** ("Morgan Stanley") is a registered broker-dealer and investment adviser headquartered in Purchase, New York. Morgan Stanley Domestic Holdings, Inc. owns 75% or more of Morgan Stanley.

## FACTS

**A. Overview of Good's Years' Long Ponzi Scheme**

16. From December 2012 to February 2022, Morgan Stanley employed Shawn Good as a broker and investment adviser representative.

17. During that time, Good solicited at least five Morgan Stanley investment advisory clients on numerous occasions to make supposed investments by transferring funds from firm

4

accounts—often drawing on Morgan Stanley credit lines offered to those clients—to Good's personal bank account.

18. Good told clients that he would use these funds to invest in land development projects and tax-free North Carolina state or municipal bonds on their behalf. Good also told the clients that these investments were "low-risk" and would pay returns of between 6% and 10% over three-month or six-month terms, though Good never provided clients with prospectuses or written agreements to confirm these promised returns and other representations.

19. At the end of supposed investment terms, Good often told clients that he had rolled their funds over into new investments with similar terms and rates of return.

20. Good's bank records and other evidence show that he raised at least $4.8 million in this scheme, including through at least 30 fraudulent investments since 2017. Good did not however use the clients' funds as promised to invest in land development projects or bonds, any low-risk or tax-free security, or any security of any kind.

21. In reality, Good was running a Ponzi scheme, in which he used new investor funds to repay former investors. Good appears to have returned about $2.8 million of victims' funds (some of which included purported profits on fictitious investments), but secretly relied heavily on Ponzi victims' investments to make the repayments. In 2020 and 2021, for example, Good used at least $1.6 million of new Ponzi-victim investments to repay other Ponzi victims.

22. Good also used investor funds to pay his personal expenses. Those included, for example, about $13,000 towards his Tesla Model 3 since July 2020; $23,000 towards his Alfa Romeo Stelvio since September 2020; $800,000 towards credit card bills since January 2017;

and $110,000 since January 2018 for Venmo payments to others, with memo lines such as "because youre sexy" (sic); "tattoo"; "Hotel for Destiny"; "Nailz"; and "shopping."

### B. Good Has Defrauded At Least Five of His Morgan Stanley Clients

23. Good's Ponzi scheme ensnared at least five investment advisory clients with limited investment knowledge and who relied on Good's investment recommendations, including a single mother of two young children who depended upon the assets to pay living expenses, a divorced and retired violin teacher, and other retirees.

24. **Investor 5**, the most recent victim, was one of Good's investment advisory clients at Morgan Stanley. She is also a divorced mother of two young children who received approximately $1.9 million in her divorce settlement in early 2020. She has worked primarily as a homemaker, a singer in the opera and a choir, and an Airbnb landlord. She has little or no investing experience, and has limited earning capacity.

25. **Investor 5** specifically told Good that her settlement was all the money that she had and would be her primary source of income with which to care for herself and her two young children.

26. In a February 2020 email, Good recommended that she invest the settlement funds "almost exclusively in municipal bonds," which would give **Investor 5** "a low risk avenue for income for [her] children and [her] long term."

27. Then, starting in May 2020, Good began recommending that **Investor 5** make a series of supposedly tax-free, pooled, municipal-bond or state-bond investments with a 6% return over a 90-day period.

28. **Investor 5** followed Good's advice.

29. To effectuate these supposed investments, Good usually proceeded in two steps. First he typically transferred funds from the **Investor 5's** Morgan Stanley accounts (including a credit line) to her personal bank account. Second, Good directed **Investor 5** to transfer those funds to a bank account in Good's name.

30. While this two-step transfer process was the usual transfer method, on at least one transfer, it appears that **Investor 5** sent Good $200,000 that was not transferred from her Morgan Stanley account.

31. Between May 2020 and December 2021, Good convinced **Investor 5** to make about 12 investments, purportedly in bonds, via transfers to his bank account—totaling $1,325,000.

32. But Good did not invest this money in bonds or any other security. Instead, he used **Investor 5's** money to pay his other expenses, including amounts Good owed to an earlier Ponzi-scheme victim. To date, Good has returned none of the **Investor 5's** funds.

33. In February 2022, **Investor 5** recorded two telephone calls with Good. During the calls, he promised that he was working on returning her funds. Good insisted that the redemption process was slower than for a typical mutual fund because the investment was in a "private fund," which he confirmed in the recorded call was a supposed North Carolina tax-free bond fund. Good also stated that he and a friend had also invested in the same private fund. In addition, Good discouraged **Investor 5** from contacting law enforcement and from hiring a lawyer, who Good said would start "digging around" and thus "hamstring" Good's efforts to redeem the supposed investments. He also directed **Investor 5** to send emails to his personal account, not his Morgan Stanley account, explaining: "I can't have any of this going to Morgan Stanley. I can't."

7

34. **Investor 4** is Investor 5's 69 year old mother. Good also solicited similar investments from **Investor 4**, a retired violin teacher, who was an advisory client of Good's at Morgan Stanley. **Investor 4** has little or no investment experience.

35. **Investor 4** asked Good to make safe investments for her, because she had limited income and would need the income to pay for future anticipated nursing care.

36. Starting around August 2019, Good convinced **Investor 4** to invest in what he called "safe," tax-free municipal bonds by transferring money out of her Morgan Stanley accounts.

37. Good initiated each transaction by moving funds from **Investor 4's** Morgan Stanley accounts (which included a credit line that **Investor 4** did not then know she had) to **Investor 4's** personal bank account. Thereafter, Good instructed **Investor 4** to wire transfer the funds to an account under Good's control.

38. Good promised that the investments would pay dividends quarterly, the first of which would be enough for $15,000 for **Investor 4's** use in a planned bathroom renovation.

39. Good later told **Investor 4** that her initial investment was doing well, thus convincing her to invest more.

40. In total, **Investor 4** invested at least $950,000 in the supposed bonds, with the last investment in November 2021. Good appears to have repaid only $16,250 to **Investor 4**.

41. As he did with **Investor 5**, Good actually used **Investor 4's** funds to repay other Ponzi victims. He also used funds from **Investor 5** and **Investor 4** to pay personal expenses. In fact, from May 2020 through December 2021, money from **Investor 5** and **Investor 4** represented over 98% of the amount deposited in a bank account that Good used for such expenses.

42. In February 2022, Good tried to solicit an additional $75,000 fraudulent investment from **Investor 4**. However, **Investor 4** declined to transfer the funds at that time, after state and Treasury Department officials contacted her about Good.

43. **Investor 3** is another investment advisory client and brokerage customer of Good at Morgan Stanley who retired in 2017 from a career as an automotive collision-repair painter. He has limited investment experience.

44. In 2016 or early 2017, Good convinced **Investor 3** to make what Good described as an investment in a fractional interest of a land development project. Good promised a tax-free, 10% return within three months on this investment.

45. Later, on Good's advice, **Investor 3** made additional investments in this fictional project, bringing his total investments to at least $1,415,000.

46. **Investor 3** funded most or all of these investments with a Morgan Stanley credit line. To effectuate these investments, Good again routed these supposed investments through Good's personal bank account, falsely describing the account to **Investor 3** as an insured business account.

47. During that period, Good assured **Investor 3** of full repayment by stating that Good himself had made the same investment and that they would get their money back soon. Good ultimately returned at least $1,398,646 to **Investor 3**—but secretly relied on other Ponzi-victims' funds to make the payments.

48. The credit line that **Investor 3** used primarily to fund these investments has an outstanding balance of $660,000 and is accruing interest of about $2,000 a month.

49. In late January or early February 2022, Good asked **Investor 3** to complete paperwork that would facilitate additional transfers between **Investor 3's** Morgan Stanley credit line and bank account, but **Investor 3** refused to complete the paperwork.

50. **Investor 2** is the co-trustee for a Morgan Stanley advisory account owned by a trust that benefits his nephew. Good is the account's investment adviser.

51. In March 2018, Good convinced **Investor 2** to invest approximately $400,000 in an ultimately fictitious, low risk real-estate project, promising $30,000 to $40,000 in profit within about six months.

52. To effectuate this investment, Good directed **Investor 2** to draw approximately $400,000 on a Morgan Stanley credit line and transfer the proceeds to Good's bank account.

53. After Morgan Stanley representatives spoke with **Investor 2** about repaying the credit line, Good repaid **Investor 2**, but he did so using funds **Investor 5** and **Investor 4** had invested in Good's Ponzi scheme.

54. Starting around December 31, 2012 and continuing through 2018, Good began soliciting **Investor 1**, a Morgan Stanley advisory client, to make a number of ultimately fictitious investments by transferring money to Good's bank account. Those investments purportedly included bonds and a land-development project and appear to have totaled over $700,000.

55. **Investor 1** eventually grew frustrated that that his Morgan Stanley account statements included no mention of these investments and successfully pressured Good to repay the investments. In making that repayment Good secretly relied partly on **Investor 3's** supposed investment in Good's Ponzi scheme.

### C. Good's Fraud Causes Significant Customer Losses

56. Good has obtained access to over $4.8 million of investor funds through his Ponzi scheme.

57. Although Good's scheme began at least as early as 2012, much of his fraud occurred more recently. Between 2017 and 2022, Good has solicited at least 30 fraudulent investments from Morgan Stanley clients

58. In operating the Ponzi scheme, Good returned only a portion of the victims' funds, resulting in over $2 million of investor losses.

59. To make those repayments, Good secretly relied heavily on other Ponzi victims' funds transferred by them for the purpose of investments.

60. In 2021, for example, Good used at least $683,000 of new Ponzi-victim investments to repay earlier Ponzi victims. In 2020, he appears to have used about $1 million from Ponzi victims for that purpose.

61. Good has also used investor funds to pay his personal expenses. Those included, for example, about $13,000 which he has paid towards his Tesla Model 3 since July 2020; approximately $23,000 the defendant has paid towards his Alfa Romeo Stelvio since September 2020; approximately $800,000 paid for Good's credit-card bills since January 2017; and about $110,000 since January 2018 for Good's Venmo payments some of which contain memo lines such as "because youre sexy" (sic); "tattoo"; "Hotel for Destiny"; "Nailz"; and "shopping."

### COUNT I—FRAUD BY GOOD
### Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

62. Paragraphs 1 through 61 are hereby realleged and are incorporated herein by reference.

63. From at least late 2012 through at least February 2022, Defendant Good, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

64. Defendant Good knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

65. In engaging in such conduct, the Defendant acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

66. By reason of the foregoing, Defendant Good directly and indirectly, has violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD BY GOOD
### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

67. Paragraphs 1 through 61 are hereby realleged and are incorporated herein by reference.

68. From at least late 2012 through at least February 2022, Defendant Good, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a) obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b) engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

69. By reason of the foregoing, the Defendant Good, directly and indirectly, has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III—FRAUD BY GOOD
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

70. Paragraphs 1 through 61 are hereby realleged and are incorporated herein by reference.

71. From at least late 2012 through at least February 2022, Defendant Good, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

72. The Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendant acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

73. By reason of the foregoing, Defendant Good, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT IV—FRAUD BY INVESTMENT ADVISER GOOD
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. § §80b-6(1), (2)]

74. Paragraphs 1 through 61 are hereby realleged and are incorporated herein by reference.

75. Defendant Good was at all relevant times an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

76. Good, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce: (a) has acted knowingly or recklessly, has employed devices, schemes, or artifices to defraud; or (b) has engaged in transactions, practices, or courses of business which operated as fraud or deceit upon a client or prospective client.

77. By reason of the transactions, acts, omissions, practices and courses of business set forth herein, Defendant Good, has violated, and unless enjoined will violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1),(2)].

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

### I.

Make findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants named herein committed the violations alleged herein.

**II.**

Issue a temporary restraining order, preliminary and permanent injunctions enjoining defendant Good, and his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice of the order by personal service or otherwise, and each of them:

a. from violating Section 17(a) of the Securities Act [15 U.S.C. 77q(a)];

b. from violating Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]; and

c. from violating Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

**III.**

Issue a conduct-based injunction that permanently enjoins Defendant Good from directly or indirectly, including, but not limited to, through any entity owned or controlled by Good, from participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent the Defendant from purchasing or selling securities for his own personal accounts.

**IV.**

An order directing Defendant Good to pay disgorgement of all ill-gotten gains or unjust enrichment and to pay prejudgment interest on the amount ordered to be disgorged, to effect the remedial purposes of the federal securities laws.

**V.**

An Order requiring Defendant Good, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)], Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. 78u(d)(3) and 78u-1] and

Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d)-(e)] to pay civil monetary penalties.

**VI.**

An Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

RESPECTFULLY SUBMITTED,

/s/ Edward G. Sullivan
M. Graham Loomis (GA Bar No. 457868)
Edward G. Sullivan (GA Bar No. 691140)
Joshua C. Hess (DC Bar No. 996445)
**U.S. Securities and Exchange Commission**
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7612
Facsimile: (404) 842-7679
sullivane@sec.gov

Attorneys for Plaintiff